IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAHMOAD ABDAH, *et al.*,     )
                                            )
       Petitioners,               )
                                            )
 v.                                )   Civil Action No. 04-1254 (HHK)
                                            )
GEORGE W. BUSH,           )
    President of the United States,  )
    *et al.*,                                )
                                            )
       Respondents.            )
_____)

## DECLARATION OF PIERRE-RICHARD PROSPER

Case 1:05-cv-01048-RMU   Document 10-2   Filed 06/03/2005   Page 1 of 9

1

I, Pierre-Richard Prosper, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am the Ambassador-at-Large for War Crimes Issues and have supervised the operation of the Department of State Office of War Crimes Issues (S/WCI) since July 13, 2001. In that capacity I advise the Secretary of State directly and formulate U.S. policy responses to serious violations of international humanitarian law committed in areas of conflict throughout the world. As the President's envoy, I travel worldwide and engage foreign government leaders and international organizations to build bilateral and international support for U.S. policies related to armed conflicts and international humanitarian law. Since September 11, 2001, my office has played a key role in maintaining a diplomatic dialogue with foreign governments whose nationals have been captured in connection with the armed conflict with the Taliban and al Qaida and who are detained at the U.S. Naval Base at Guantanamo Bay, Cuba. The following statements provide a general overview of the Department of State role in carrying out United States policy with respect to the transfer to foreign governments of detainees held by the Department of Defense at Guantanamo Bay and the process that is followed to ensure that any international obligations and United States policies are properly implemented. They are not intended to be an exhaustive description of all of the steps that might be undertaken in any particular case, but do reflect United States policy and practices with respect to transfers from Guantanamo. I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The United States has no interest in detaining enemy combatants longer than necessary. The paramount goal is to ensure, to the maximum extent reasonably possible, that transferring a detainee out of U.S. Government control prior to the cessation of hostilities will

2

not increase the risk of further attacks on the United States or its allies. The Secretary of Defense, or his designee, is generally responsible for approving the transfer of detainees from Department of Defense control at Guantanamo Bay to other governments either for release or for further detention, investigation, prosecution or control, as appropriate. On an ongoing basis, the Department of Defense reviews the continued detention of each individual it holds at Guantanamo Bay Naval Base, Cuba. As a result of this review process, two hundred and eleven (211) detainees have departed Guantanamo, with 146 transferred for release, and 65 transferred to the control of host governments for further detention, investigation and prosecution, as appropriate. Of those 65 detainees who have been transferred to the control of host governments, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to Morocco; 6 to France, 4 to Saudi Arabia, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait, and 1 to Australia.

3. The Department of Defense consults with appropriate United States Government agencies, including the Department of State, before determining whether to transfer particular individuals. Detainees have been transferred for release when it is determined that they no longer meet the criteria of enemy combatants or no longer pose a continuing threat to the U.S. security interests. Detainees have been transferred to the control of their governments of nationality when those governments are prepared to take the steps necessary to ensure that the detainees will not pose a continuing threat to the United States. A detainee may be considered for transfer to a country other than his country of nationality, such as in circumstances where that country requests transfer of the detainee for purposes of criminal prosecution.

4. Of particular concern to the Department of State in making recommendations on

3

transfers is the question of whether the foreign government concerned will treat the detainee humanely, in a manner consistent with its international obligations, and will not persecute the individual on the basis of his race, religion, nationality, membership in a social group, or political opinion. The Department is particularly mindful of the longstanding policy of the United States not to transfer a person to a country if it determines that it is more likely than not that the person will be tortured or, in appropriate cases, that the person has a well-founded fear of persecution and would not be disqualified from persecution protection on criminal- or security-related grounds. This policy is consistent with the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention") and the Convention Relating to the Status of Refugees ("Refugee Convention"). The Department of State works closely with the Department of Defense and relevant agencies to advise on the likelihood of persecution or torture in a given country and the adequacy and credibility of assurances obtained from a particular foreign government prior to any transfer.

5. The Department of State generally has responsibility to communicate on these matters as between the U.S. and foreign governments. The Department of State receives requests from foreign governments for the transfer of detainees and forwards such requests to the Department of Defense for coordination with appropriate Departments and agencies of the United States Government. The Department of State also communicates requests from the United States to foreign governments to accept the transfer of their nationals.

6. Once the Department of Defense has approved a transfer from Guantanamo Bay and requests the assistance of the Department of State, my office would initiate transfer discussions with the foreign government concerned. The primary purpose of these discussions is to learn

4

what measures the receiving government is likely to take to ensure that the detainee will not pose a continuing threat to the United States or its allies and to obtain appropriate transfer assurances. My office seeks assurances that the United States Government considers necessary and appropriate for the country in question. Among the assurances sought in every transfer case in which continued detention by the government concerned is foreseen is the assurance of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer. The Department of State considers whether the State in question is party to the relevant treaties, such as the Torture Convention, and pursues more specific assurances if the State concerned is not a party or other circumstances warrant.

      7. Decisions with respect to Guantanamo detainees are made on a case-by-case basis, taking into account the particular circumstances of the transfer, the country, the individual concerned, and any concerns regarding torture or persecution that may arise. Recommendations by the Department of State are decided at senior levels through a process involving Department officials most familiar with international legal standards and obligations and the conditions in the countries concerned. Within the Department of State, my office, together with the Office of the Legal Adviser, the Bureau of Democracy, Human Rights, and Labor, and the relevant regional bureau, normally evaluate foreign government assurances and any need for protection, and, if deemed appropriate, brief the Secretary or other Department Principals before finalizing the position of the Department of State. The views of the Bureau of Democracy, Human Rights, and Labor, which drafts the U.S. Government's annual Human

5

Rights Reports,[1] and of the relevant regional bureau, country desk, or U.S. Embassy are important in evaluating foreign government assurances and any individual persecution or torture claims, because they are knowledgeable about matters such as human rights, prison conditions, and prisoners' access to counsel in general and as they may apply to a particular case in the foreign country concerned, as well as particular information about the entity or individual that that is offering the assurance in any particular case.

8. The essential question in evaluating foreign government assurances is whether the competent Department of State officials believe it is more likely than not that the individual will be tortured in the country to which he is being transferred. In determining whether it is "more likely than not" that an individual would be tortured, the United States takes into account the treatment the individual is likely to receive upon transfer, including, *inter alia,* the expressed commitments of officials from the foreign government accepting transfer. When evaluating the adequacy of any assurances, Department officials consider the identity, position, or other information concerning the official relaying the assurances, and political or legal developments in the foreign country concerned that would provide context for the assurances provided. Department officials may also consider U.S. diplomatic relations with the country concerned when evaluating assurances. For instance, Department officials may make a judgment regarding foreign government's incentives and capacities to fulfill its assurances to the United States, including the importance to the government concerned of maintaining good relations and cooperation with the United States. In an appropriate case, the Department of State may also

---

[1] The Human Rights Reports are the official State Department reports to Congress on human rights conditions in individual countries for a given year as mandated by law (sections 116(d) and 502(b) of the Foreign Assistance Act of 1961, as amended, and section 505(c) of the Trade Act of 1974, as amended).

6

consider seeking the foreign government's assurance of access by governmental or non-governmental entities in the country concerned to monitor the condition of an individual returned to that country, or of U.S. Government access to the individual for such purposes. In instances in which the United States transfers an individual subject to assurances, it would pursue any credible report and take appropriate action if it had reason to believe that those assurances would not be, or had not been, honored. In an instance in which specific concerns about the treatment an individual may receive cannot be resolved satisfactorily, we have in the past and would in the future recommend against transfer, consistent with the United States policy.

9. The Department of State's ability to seek and obtain assurances from a foreign government depends in part on the Department's ability to treat its dealings with the foreign government with discretion. Consistent with the diplomatic sensitivities that surround the Department's communications with foreign governments concerning allegations relating to torture, the Department of State does not unilaterally make public the specific assurances or other precautionary measures obtained in order to avoid the chilling effects of making such discussions public and the possible damage to our ability to conduct foreign relations. Seeking assurances may be seen as raising questions about the requesting State's institutions or commitment to the rule of law, even in cases where the assurances are sought to highlight the issue for the country concerned and satisfy the Department that the country is aware of the concerns raised and is in a position to undertake a commitment of humane treatment of a particular individual. There also may be circumstances where it may be important to protect sources of information (such as sources within a foreign government) about a government's

7

willingness or capability to abide by assurances concerning humane treatment or relevant international obligations.

10. If the Department were required unilaterally to disclose outside appropriate Executive branch channels its communications with a foreign government relating to particular mistreatment or torture concerns, that government, as well as other governments, would likely be reluctant in the future to communicate frankly with the United States concerning such issues. I know from experience that the delicate diplomatic exchange that is often required in these contexts cannot occur effectively except in a confidential setting. Later review in a public forum of the Department's dealings with a particular foreign government regarding transfer matters would seriously undermine our ability to investigate allegations of mistreatment or torture that come to our attention and to reach acceptable accommodations with other governments to address those important concerns.

11. The Department's recommendation concerning transfer relies heavily on the facts and analyses provided by various offices within the Department, including its Embassies. Confidentiality is often essential to ensure that the advice and analysis provided by these offices are useful and informative for the decision-maker. If those offices are expected to provide candid and useful assessments, they normally need to know that their reports will not later be publicly disclosed or brought to the attention of officials and others in the foreign States with which they deal on a regular basis. Such disclosure could chill important sources of information and could interfere with the ability of our foreign relations personnel to interact effectively with foreign State officials.

8

12. Without addressing the specifics of any particular individual, a court decision to enjoin a detainee transfer, either altogether or until further order of the court, would undermine the United States' ability to reduce the numbers of individuals under U.S. control and our effectiveness in eliciting the cooperation of other governments in bringing to justice individuals who are subject to their jurisdiction. Any judicial decision to review a transfer decision by the United States Government or the diplomatic dialogue with a foreign government concerning the terms of transfer could seriously undermine our foreign relations. Moreover, judicial review of Department of Defense determinations to transfer an individual detainee to a foreign government inevitably would encumber and add delays to what is already a lengthy process. Any judicial review and the resulting delays could undermine a foreign government's ability to prosecute and also harm United States' efforts to press other countries to act more expeditiously in bringing terrorists and their supporters to justice.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on March 8, 2005.

Pierre-Richard Prosper